# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

LYNN A. COYLE,

        Plaintiff,

v.                                      No. CIV 02-364 MV/LFG

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## MAGISTRATE JUDGE'S ANALYSIS
## AND RECOMMENDED DISPOSITION[1]

Plaintiff Lynn A. Coyle ("Coyle") invokes this Court's jurisdiction under 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner determined that Coyle was not eligible for disability insurance benefits ("DIB") or Supplemental Security Income ("SSI"). Coyle moves this Court for an order reversing for payment of benefits, alternatively remanding for a rehearing. [Doc. 9.]

Coyle was born on March 29, 1948 and was 51 years old when the third administrative hearing was held. She currently has two Master's degrees and past relevant work experience as a

---

[1] Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations. A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the findings and recommendations. If no objections are filed, no appellate review will be allowed.

high school art teacher, adolescent counselor, and a chemical dependency counselor.  [Tr. at 72, 82, 445.]  She is divorced and lives alone.  [Tr. at 31.]

This case has been ongoing for over ten years.  Coyle had three administrative hearings, and three different administrative law judges ("ALJs") have issued decisions adverse to Coyle.  On October 21, 1992, Coyle applied for social security benefits, alleging an onset date of November 27, 1991, due to a back and neck injury and depression.  [Doc. 10, p. 1; Tr. at 30.]  In December 1993, ALJ Jon D. Boltz held the first administrative hearing, during which Coyle represented herself.  On November 21,1994, the ALJ denied Coyle's application for disability benefits, although he found that Coyle had severe mental and physical impairments.  Judge Boltz determined that Coyle could not return to her past relevant work but that she could perform light work, and therefore, was not disabled.  [Tr. at 273-280.]  On December 18, 1995, the Appeals Council vacated Judge Boltz's opinion and remanded  the matter to the ALJ based on new and material evidence.  [Tr. at 294-296.]  The ALJ was directed to consider the new evidence and obtain additional evidence regarding Coyle's depression, as well as evidence from a vocational expert ("VE").  [Id.]

ALJ John J. Wren handled the first remand and held a hearing on August 7, 1996.  [Tr. at 15-19.]  Coyle continued to represent herself.  [Tr. at 15.]  At that time, Coyle was working on a Master's degree in fine arts, specifically art therapy, and held part-time employment in that field.  [Tr. at 16.]  She alleged the following impairments:  chronic back and knee pain; a left shoulder mass; chronic diarrhea; major depression; post traumatic stress disorder; and a borderline personality disorder.  [Id.]  Judge Wren found that Coyle failed to meet her burden of proof and to demonstrate that any severe underlying mental impairment caused more than a minimal impact on her capacities for work related functioning.  [Id.]  The ALJ concluded that she retained the RFC for light work and

ability to perform her past work as a counselor.  Coyle requested review, in part accusing Judge Wren of unprofessional and unethical behavior.  [Tr. at 9.]  The Appeals Council declined Coyle's request for review, and Coyle filed a federal lawsuit/appeal.  [Tr. at 6, 486.]  While there was no basis for Coyle's complaints of judicial impropriety, the parties nonetheless agreed to remand after Coyle served her brief on the Commissioner.  The remand Order required an update of the medical record, further consultative mental exam, further evaluation of Coyle's RFC, and specific consideration of her diagnosis of fibromyalgia.  [Tr. at 488.]

ALJ Larry E. Johnson handled the second remand and held the third hearing on January 20, 2000.  [Tr. at 569-600.]  Coyle was represented by Attorney Gary Martone.  On April 24, 2000, Judge Johnson issued a decision denying Coyle's benefit application.  [Tr. at 444-453.]  As of January 2000, Coyle was a teacher at Valley High School.  [Tr. at 446.]  Like Judge Wren, ALJ Johnson concluded that Coyle failed to satisfy her burden of proving her personality disorder was a severe impairment.  [Id.]  Judge Johnson further determined that Coyle could not return to her past relevant work, but that based on the grids, she was able to perform light work.  [Tr. at 452.]  The Appeals Council declined Coyle's request for review.  [Tr. 435-437, 464.]  Now, nearly ten years from Coyle's original application, this appeal follows.

## Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[2] The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the

---

[2]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[3]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[4] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits [her] physical or mental ability to do basic work activities . . . .,"[5] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[6] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[7]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's residual functional capacity ("RFC"),[8] age, education and past work experience, she is capable of performing other work.[9]  If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove she cannot, in fact, perform that work.[10]

---

[3]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[4]20 C.F.R. § 404.1520(b) (1999).

[5]20 C.F.R. § 404.1520(c) (1999).

[6]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent [her] from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[7]20 C.F.R. § 404.1520(e) (1999).

[8]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[9]20 C.F.R. § 404.1520(f) (1999).

[10]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

The ALJ can meet his burden of proof at step five in two ways: (1) by relying on a vocational expert's testimony; and/or (2) by relying on the "appendix two grids." Taylor v. Callahan, 969 F. Supp. 664, 669 (D. Kan. 1997).  For example, expert vocational testimony might be used to demonstrate that the plaintiff can perform other jobs in the economy.  Id. at 669-670.  Before applying the grids, the ALJ must first find the following:  "(1) that the claimant has no significant non-exertional impairment; (2) that the claimant can do the full range of work at a particular residual functional capacity on a daily basis; and (3) that the claimant can perform most of the jobs in that residual functional capacity category."  Id. at 669 (*relying on* Thompson v. Sullivan, 987 F.2d 1482, 1488 (10th Cir. 1993)).  Non-exertional limitations can include mental impairments.  The grids do not consider non-exertional limitations; therefore, if significant non-exertional limitations are present, the grids may not be applicable.  Id.  However, the "mere presence of a nonexertional impairment does not preclude reliance on the grids, but the nonexertional impairment must interfere with the ability to work."  Id. (internal citations omitted.)  In this case, ALJ Johnson conclusively used the grids in reaching his decision at step five of the analysis and did not utilize a vocational expert.

### Standard of Review and Allegations of Error

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992); Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).  The Court's review of the Commissioner's determination is limited.  Hamilton v. Secretary of Health & Human Servs., 961 F.2d

1495, 1497 (10th Cir. 1992).  The Court's function is to determine whether the record as a whole

contains substantial evidence to support the Commissioner's decision and whether the correct legal

standards were applied.  Id. at 1497-98.  In Clifton v. Chater, the Tenth Circuit described, for

purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the
> evidence, but an ALJ is not required to discuss every piece of
> evidence.  Rather, in addition to discussing the evidence supporting
> his decision, the ALJ must discuss the uncontroverted evidence he
> chooses not to rely upon, as well as the significantly probative
> evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).  If

supported by substantial evidence, the decision of the Commissioner is conclusive and must be

affirmed.  The Court cannot re-weigh the evidence or substitute its judgment for that of the

Commissioner.  Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

     In accordance with the remand Order, Coyle was provided a consultative psychological exam

and the ALJ considered medical evidence regarding Coyle's condition of fibromyalgia, in addition to

holding  another administrative hearing.  After reviewing Coyle's medical records, symptoms and

complaints, and after considering the previous two ALJs' opinions, Judge Johnson rejected Coyle's

claim for benefits at step five, concluding that she was not precluded from performing a full range of

light work.  [Tr. at 446, 450-51.]  In reaching this decision, the ALJ made the following findings

before utilizing the grids:  (1) Coyle had not engaged in post-onset substantial gainful activity since

November 27, 1991, the alleged date of onset;[11] (2) Coyle had severe physical impairments but not

---

[11]Martone, Coyle's attorney, stated in a letter to the ALJ, dated Jan. 18, 2000, that Coyle's applications
were for a claim for closed periods from November 27, 1991 through April 1995, and from January 1997 through
September 1998, based on periods when she allegedly could not work and/or did not make enough money to
disqualify her.  [Tr. at 565.]  ALJ Johnson did not consider her claims in terms of the proposed closed periods.

severe mental impairments; (3) the impairments did not meet or medically equal one of the listed impairments; (4) Coyle's allegations regarding her limitations were not totally credible; (5) she was unable to perform any category of her past relevant work; and (6) Coyle had a RFC for no more than light work on a sustained basis.   Judge Johnson also found that Coyle was both a "younger individual" and an "individual closely approaching advanced age" during the times under consideration.  [Tr. at 451-52.]  At the fifth step of the sequential analysis, the ALJ applied the grids, without any vocational expert testimony,[12] and decided that the grids directed a conclusion that Coyle was not disabled during the time period at issue based on an exertional capacity for light work, along with her age, education and work experience.  [Tr. at 452.]

### Summary of Coyle's Employment and Medical History

Not surprisingly, after two remands and three administrative hearings, Coyle's administrative record is substantial and totals 600 pages.  The Court provides the following summary and/or highlights of those records.

During the 1980's, Coyle worked as a chemical dependency counselor, a reporter/writer, and a graphic designer/PR/media consultant.  In the early 1990's she worked as an adolescent counselor, art therapist and community outreach coordinator.  [Tr. at 72.]  The positions, as she described them, involved self supervision, supervision of others, and taking initiative.  In the Fall of 1992, she wrote that she could not return to any of these positions due to her physical injuries, lack of mobility, chronic pain, sleep disorder, depression, job-related stress, trauma, disappointment and side effects

---

[12]Judge Johnson had a VE available but decided that the vocational issues were not as prevalent as he had anticipated before hearing Coyle's testimony, and therefore, the VE was not utilized.  [Tr. at 597.]

of medications.  [Tr. at 77, 81.]  She further stated on the disability forms that surviving on a daily basis was all she could handle.

On August 16, 1988, Coyle fell in a hole, hurting her knee and shoulder.  [Tr. at 115.]  Her shoulder had a subcapital fracture.[13]  [Tr. at 117.] Her doctor wrote her a note, stating that she should be off work for two months.  [Tr. at 226.]

On November 22, 1991, Coyle was involved in a rear end auto accident and injured her back.  [Tr. at 103, 105.]  On examination, she was alert and in no acute distress.  A later psychological record notes that the damage to the car was minimal and totaled only $36.00.  [Tr. at 205.] She was in overall good condition and discharged.  [Tr. at 105.]  Her x-ray was interpreted to show a possible transverse process fracture.[14]  [Tr. at 102.]  She returned to the Emergency Room in Baltimore on December 2, 1991, in no apparent distress.  She told the physician she almost left the emergency room since she had not been seen for an hour.  [Tr. at 102.]  At that time, she was taking Synthroid, Prozac and Motrin.  [Tr. at 98, 105.]

In January 1992, Coyle moved from Baltimore to Albuquerque to pursue a graduate degree in art therapy at UNM.  [Tr. at 235.]  She reported that the Prozac was effective although she encountered insomnia as a side effect.  [Tr. at 235.] Physicians at UNM's Student Health Center and Urgent Care frequently saw Coyle in 1992.  She also was seen  regularly by a physical therapist.  [Tr. at 257.]  Overall, Coyle made many visits to doctors, physical therapists and counselors.  The records indicate that she arrived late to a number of appointments and missed some of them.  [*See, e.g.,* Tr. at 186, 202, 206, 237, 266, 509.]

---

[13]Fracture of a bone, below the head.

[14]One doctor believed the problem could have derived either from a fracture or a congenital process.

-8-

On February 6, 1992, Dr. Katherine Williams at the UNM Student Health Center saw Coyle for pain and fatigue, and  noted possible fibromyalgia and depression.  [Tr. at 153.]  On February 17, 1992, Coyle was trying some different medications for pain related to fibromyalgia.  She was unable to take Amitriptyline/Elavil.  [Tr. at 236.]  She was started on BuSpar[15] as an adjunct to Prozac.  The doctor's assessment on February 17 was "major depression."  [Tr. at 236.]  On March 5, Coyle reported tremors and agitation since starting the BuSpar.  [Tr. at 239.]

In March 1992, Coyle was traveling to Mexico with the UNM orchestra.  [Tr. at 134.]  On March 17, 1992, the record shows she was starting a new job.  [Tr. at 137.]  On March 24, 1992, she was "feeling good, chipper."  [Tr. at 136.]  In February or March, Dr. Dawes, at UNM Student Health, reported that he would follow up on the disability forms for deferment of student loans.  [Tr. at 238.]

In April 1992, she complained of inhaling "bad fumes" while at the UNM Zimmerman Library.  [Tr. at 135.]  On April 7, 1992, the physical therapist noted that Coyle felt quite fatigued due to working long hours.  [Tr. at 136.]  A May 18, 1992 medical record indicates that Coyle had been doing well on Prozac for over a year.  [Tr. at 134.]  Another May 18 record shows that Coyle was "disappointed with the response she received to her grievance (unofficial) with her therapist at the Dept. of Psychology.  These events have 'depressed' her. . . ."  [Tr. at 240.]  She was being referred to Dr. Dana Allen as a psychologist.

Dr. Allen provided weekly psychotherapy to Coyle from May 15, 1992 until June 2, 1993.  [Tr. at 167-216, 260.]  Dr. Allen was a 4th year psychiatric resident at UNM Mental Health.  [Tr. at 178, 241.]  On May 15, Dr. Allen noted Coyle's previous addiction problems that were in remission.

---

[15]BuSpar is an anti-anxiety medicine used to reduce fear, tension and anxiety.  www.rxlist.com.

[Tr. at 216.]  Coyle was "very bright, well read and educated."  [Tr. at 215.]  She was encountering problems or stress in the graduate school program.  She had a part time job in the graduate program.  [Tr. at 214.]  Coyle reported a long history of working with therapists on various issues, particularly family matters.  She had spent much of her life as a "perpetual student."

On July 9, 1992, Coyle complained of a rash.  She had recently been in Mexico.  [Tr. at 132.]  On July 14, 1992, the medical record notes that Coyle has suicidal ideation.  She saw Dr. Williams for her shoulder pain and depression.  She reported that Prozac was helping some but then periodically she felt more depressed.  [Tr. at 130.]  Dr. Allen stated that she was stressed on July 10, 1992 due to not getting accepted into the art therapy grad program.  [Tr. at 211.]  On July 17, she reported to Dr. Allen some suicidal thoughts but stated she had decided to "stick around" because she was "curious about how things would work out."  [Tr. at 210.]   On July 20, 1992, Coyle wondered if she should stop the Prozac because of side effects.  She agreed that the depression episodes were very situationally dependent.  [Tr. at 129.]

As of August 6, 1992, she was having back pain and wondered if it was related to her trying to jog again.  [Tr. at 128.]  On August 13, 1992, Coyle was seen at the orthopedic clinic.  She had multiple aches and complaints.  The impressions were fibromyalgia and depression.  She was referred for massage therapy.  [Tr. at 127.]

The August 14, 1992 therapy record discusses Coyle's previous mental health records that Dr. Allen apparently obtained.  [Tr. at 204-05.]  The records, as summarized by Dr. Allen, state that one prior psychologist in Maryland described Coyle as having "erratic behavior," "chronic suicidal ideation," and "severely impaired coping [skills]," and included a list of 17 prior therapists.  "Other notes reported impression of long term interpersonal relationship and employment problems, a

-10-

passive/aggressive controlling and controlling style . . . ." [Tr. at 204.] Coyle apparently had "legal cases pending" and was suing for damages with respect to the November 1991 car accident. Dr. Allen stated that a June 24, 1992 medical advisory review insurance report showed that her car had suffered minimal damage of $36.00, her L-spine x-ray showed a "deformity," rather than a fracture, and that an insurance company concluded that the problems she suffered after the accident were not causally related to the accident. [Tr. at 205.]

Coyle was frustrated and depressed during the August 14 therapy session. [Tr. at 203.] She requested a 5 minute warning which was given before the close of each session, but she still became upset at the end, and "became histrionic, tearful and tried multiple times to extend session." [Tr. at 203.] She mentioned suicidal ideation but admitted that it was "emotional blackmail."

On August 21, Coyle arrived ten minutes late to her session and wore dark glasses throughout the session. [Tr. at 202.] The next week, Coyle was on time, smiling and without dark glasses. [Tr. at 201.] She appeared to be in a good mood with the start of her classes. On September 11, she reported vague, intermittent suicidal ideation. She reported that she "lived for" her art therapy classes. [Tr. at 199.]

On September 25, Coyle was very depressed, anxious and rageful at times. She was tired and had body pains. She was having difficulties with her art therapy classes and varying points of view of classmates. She spoke of poor energy, poor self care, poor sleep, poor motivation, and feeling suicidal intermittently. However, she had friends with whom to talk. She was not feeling validated by Dr. Allen and wanted affirmations that she was pretty, smart, and effective. [Tr. at 197.]

On October 2, Coyle and Dr. Allen spoke about her pattern of getting angry with therapists and "therapist hopping." [Tr. at 196.] On October 28, Coyle and Dr. Allen discussed making a new long term contract for Coyle's self safety (no suicide action). [Tr. at 191.]

On December 11, 1992, Coyle was excited about her classes ending and proud about her recent school work. She was bright and cheerful but concerned about the holidays. She spoke about hospitalization being an option but they agreed that the outpatient plan was in Coyle's best interest. [Tr. at 187.]

On January 8, 1993, Coyle arrived late and almost did not come at all because she was so depressed and just wished to stay in bed. She felt lonely and abandoned over the holidays. [Tr. at 186.] On January 22, she was depressed and intermittently suicidal, but "keeping busy." Dr. Allen told Coyle that she planned to start a new position in July and would stop seeing Coyle in June. Although Coyle took the upcoming change fairly well, it raised abandonment issues for her. [Tr. at 179, 181.]

At a doctor's appointment on February 12, 1993, Coyle was concerned with diarrhea and an eating disorder. [Tr. at 125.] On February 22, 1993, Dr. Kathryn Williams noted that Coyle needed her Synthroid increased. [Tr. at 124.] She was seen at Urgent Care on April 29, 1993, and apparently was on too much Synthroid. [Tr. at 120.]

On March 12, 1993, Coyle spoke to Dr. Allen about her upcoming deadlines for her art school application and the notification of acceptance. She alternated between feeling she would end her life if not accepted and wanting to fight to get into school any way she could. [Tr. at 176.] On March 26, Coyle told Dr. Allen that she had a plan [regarding suicide] but that she would not tell Allen what it was. She later admitted she had no current suicidal ideation. [Tr. at 175.] On March 31, Coyle

arrived to her session carrying her art projects, including slides, pictures and drawings which she described as being her life.

On March 22, 1993, a psychiatric examination was performed on Coyle by Dr. Carlos Balcazar for disability services. [Tr. at 219.] Coyle wore dark glasses throughout the exam. [Tr. at 221.] Dr. Balcazar noted that Coyle's "main complaints at the present are of physical nature." She also told Dr. Balcazar that she was experiencing depression that had been going on for many years. She first saw a psychiatrist at age 15. She used sedative drugs and smoked marijuana and abused alcohol from about age 15 to 28. In 1969, she was hospitalized after a suicidal gesture involving an overdose of medication. [Tr. at 219-220.] In 1976, she was hospitalized for detoxification and stayed in the hospital for about 60 days. She reported to Dr. Balcazar that she had not used alcohol or drugs since then.

Coyle also discussed with Dr. Balcazar her job history and reported that she was receiving unemployment compensation due to her work in Maryland. The main reason she had not worked since coming to New Mexico was because of physical problems. [Tr. at 221.]

Coyle gave appropriate answers to Balcazar's questions. He believed she had average intelligence and that her memory was well-preserved. [Tr. at 221.] He concluded that her complaints were characterized by low and mid-back pain, along with numbness and motor limitation in her left arm. While she had problems with depression, Dr. Balcazar's impression was that most of these problems resulted from her "personality traits." He diagnosed her has having dysthymic disorder, atypical personality disorder, alcohol and polydrug abuse presently in remission, and back pain and motor limitations. He reported that Coyle's psycho-social stressors during the last year were moderate and that her optimal functioning during the past year was poor. Dr. Balcazar believed she

-13-

had adequate judgment to plan a work sequence and that she could use tools and materials for simple jobs. He believed her "main handicap" to be of a physical nature and recommended that it be medically appraised. [Tr. at 222.]

On about April 1, 1993, a functional capacity assessment was performed. No significant limitations were noted. Coyle was 45 then and working on her MA degree. The consultant noted Coyle's history of at least 4 hospitalizations and prior poly-substance abuse. [Tr. at 42.] The medical consultant further stated that "this woman has the ability to perform (at least) simple, routine, repetitive work. [Id.] A psychiatric review in 1993 showed that she had affective disorders, substance addiction disorders and dysthymia. The ratings of impairment severity, however, were slight to moderate or seldom. [Tr. at 51.]

The first ALJ hearing was held December 22, 1993 before Judge Boltz. [Tr. at 382-410.] Coyle wore dark glasses in the hearing because of her sensitivity to bright light. [Tr. at 404, 406.] She told the ALJ that she feared a 9 to 5 type of job because she had trouble getting up. There were times when she did not want to face the day. [Tr. at 391.] She indicated she no longer was on Prozac or any anti-depressant; Prozac made her feel suicidal. [Tr. at 392.] The Motrin she took definitely took the edge off her physical pain. [Tr. at 393.] She was no longer able to do the things she liked to do, e.g., tennis, running, being a potter. She was able to walk one, two or three blocks. [Tr. at 396.] She thought she could sit for up to an hour before needing to stand. She could stand for 30 to 45 minutes at a time, but then decided 15 minutes was more accurate. She thought she could lift 15 pounds but then was not sure. [Tr. at 398.] Her depression kept her from work, but she was a little ambivalent as to whether she could work with depression. [Tr. at 402.] The depression made her not want to live, not want to face the day. [Tr. at 399.] She spent part of her day reading. She

-14-

questioned Dr. Balcazar's evaluation of her which was based on a short interview, and "being in the mental health care field myself, it's hard to really make an assessment." [Tr. at 405.]

As of January 7, 1994, she reported having diarrhea for two months. [Tr. at 347.] On June 17, 1994, Dr. Samir Roy[16] performed a psychiatric evaluation of Coyle, as a result of a referral from Division of Vocational Rehabilitation ("DVR"). [Tr. at 302, 303.] She was not taking any anti-depressants. [Tr. at 303.] Dr. Roy noted her history of substance abuse, and a long standing history of colitis. She suffered from hypothyroidism, hypoglycemia and had developed chromatic fibrous in her left upper arm, which had tumor-like presentations in the past. One of her sisters committed suicide. Coyle had a Master's level of training but never finished her Master's Degree in Baltimore. [Id.] It seems that her prior master's work was in counseling. [Tr. at 309.] Dr. Roy's psychiatric impression was major depression, possible bipolar affective disorder, alcohol dependence in remission, possible hysterical personality disorder, hypothyroidism, colitis, hypoglycemia, fibrous tumors. He gave her a GAF of 60 for the past year. [Tr. at 304-05.]

Dr. Roy opined that she was suffering from a long-standing psychiatric disability with a history of poly-substance abuse. She was "developing 'learned helplessness syndrome,'" which "could affect her ability to re-integrate into the job market in a gainful fashion." [Tr. at 302.] He recommended intensive psychotherapy with pharmacotherapy.

On June 21, 1994, Coyle began to see a new therapist, R. Renee Richardson, in weekly psychotherapy. [Tr. at 515.] Her therapy notes contain primarily spiritual discussions and dream or

---

[16]On October 21, 1996, when Coyle represented herself, she challenged any reliance by the ALJ on Roy's report because in June 1995, Roy was investigated for trying to set a fire to the home of one of his patient's, a news story that was reported by the media. [Tr. at 10, 11.] In contrast, Coyle's attorney later argued that Roy was a treating physician, whose opinion the ALJ did not properly consider. [Tr. at 472.]

imagery work.  On July 6, 1994, Coyle reported that she was stressed and quit her job.  [Tr. at 515.]

Some of the records document continuing depression and suicidal ideation.

On July 29, 1994, Coyle was seen by Dr. Williams as a walk-in patient.  She had stabbed her

hand with a pen and wanted to get the wound cleaned up.  [Tr. at 339.]  In August 1994, Coyle saw

a physician about the pain and tumor in her arm.  The doctor noted that her history was "very

strange."  [Tr. at 306.]  Dr. Williams again saw Coyle as a "walk in" on August 22 for her lower back

pain.  [Tr. at 338.  Another physician (apparently referred by DVR) also saw her on August 22,

noting a current GAF of 60, past year of 70.  [Tr. at 308, 310.]  The physician discussed medication

possibilities with Coyle and that her diagnoses of major depression, PTSD, obsessive/compulsive

disorder and eating disorder all could potentially be treated by a single medication.  She was to try

Paxil.

On August 23, 1994, Richardson noted that Coyle was expressing depression and suicidal

ideation.  She had started taking Paxil but with reservations.  Coyle was to begin school that week

and an internship.  [Tr. at 364.]

On September 12, 1994, she reported having stopped Paxil due to side effects.  Also on

September 12, 1994, Dr. Daniel C. Wascher, an orthopedist with University Hospital, saw Coyle

regarding complaints of back and leg pain.  He prescribed Flexeril, Daypro and physical therapy.  [Tr.

at 312.]  Coyle saw Dr. Orcutt about her back on October 6.  Dr. Orcutt noted that she had a right-

ward list when standing or walking, that she was unable to bend to touch her toes.  Her x-rays, taken

on September 12, were normal.  She was to undergo exercise, including bicycling and swimming.

On October 10, Coyle's symptoms were "somewhat improved" with massage therapy and light

aerobic activity.  [Tr. at 334.]  On October 11, 1994, Dr. Wascher wrote a letter, addressed to whom

it may concern, stating that he had treated Coyle over the past few years for her back injury.  X-rays showed some mild facet degeneration in the lumbar spine region and that her transverse process fractures had healed.  He concluded that Coyle suffered from chronic low back pain and might have spinal stenosis.  He provided no opinions regarding her ability to work.  [Tr. at 313.]

On October 18, 1994, Therapist Richardson provided an update on Coyle's therapy to DVR. Coyle was still depressed and her eating disorder was recurring.  "The risk of suicide is possible though not probable at this time."  [Tr. at 363.]

ALJ Boltz issued a decision in November 1994.  [Tr. at 273.]  Coyle's work study, part-time employment at the UNM Children's Hospital was not considered substantial gainful activity.  [Tr. at 274.]  Judge Boltz considered her physical and psychological impairments to be severe but not at a listing level.  He noted that she was capable of adequately completing her graduate school courses and working part-time despite her conditions, and that her conditions were effectively treated with medication, physical therapy and psychotherapy.  [Tr. at 275.]  She apparently had stopped taking Prozac but was functioning without it.  He concluded that she retained the RFC to perform a full range of light work, which was consistent with her current work and school work.

Coyle wrote a letter requesting review of the ALJ's decision, in which stated that she was fired from the only two positions she held at UNM -- in the Fine Arts Department and at Childlife at UNMH.  [Tr. at 288-91.]  She reported being fired for tardiness due to pain and severe depression, and "decomposed relating and communicating."  She included employment evaluations showing some "very good" ratings, but other ratings where she needed improvement but was showing progress, particularly in her communications with other staff members.  She refused to sign the evaluation form that showed an overall "needs improvement but showing progress."  [Tr. at 297-98.]  In the request

-17-

for review, she also wrote that she had not been doing that well with her classes and had been struggling within the department.  She complained of the lengthy wait between her hearing date and the ALJ's decision, and that the consulting psychiatrist spent no more than 15 minutes with her.  [Tr. at 291.]

On November 29, 1994, Therapist Richardson wrote a progress report on Coyle to the DVR. Coyle was crying frequently, depressed and complaining about lack of concentration, but she refused to take any psychotropic medications due to side effects.  [Tr. at 362.]

On January 17, 1995, Coyle began a new internship and stated that she loved the women at work.  [Tr. at 509.]  She was trying a new womens' spirituality group.  Coyle's mother and her grandfather died near this time.  [Tr. at 508.]  She lost her internship in February 1995.  She apparently revealed to her therapist that she was shoplifting and was sometimes caught.  [Tr. at 506, 507, 500.]

On May 15, 1995, Coyle saw Dr. McGuire (orthopedic physician) regarding her back pain that had increased and the benign left arm mass that was growing in size.  [Tr. at 333.]  She did not want an x-ray to be done of her arm because of multiple previous x-rays to that area.  She was to continue with physical therapy.

Therapist Richardson addressed a progress note about Coyle to the DVR, dated August 10, 1995.  [Tr. at 361.]  Coyle had started to do better but had increased problems with the loss of her mother and grandfather.  Richardson encouraged Coyle to try an anti-depressant and to be evaluated for medication.  Richardson requested additional sessions be approved by DVR.

It appears that on December 5, 1995, Coyle was relieved about her recent appearance in court related to shoplifting charges and the requirement that she receive treatment for 60 days.  [Tr. at

494.] On December 12, 1995, Coyle decided to quite therapy because her therapist had not attended

Coyle's graduation, but she resumed therapy the next week.  [Tr. at 498.]

On January 24, 1996, Coyle received a job performance evaluation in her role as Recreation

Assistant.  Her peers thought she was rude and very inconsiderate of other staff and their roles.  She

tended to get stressed out and lacked patience.  [Tr. at 380.]

It appears that Coyle started going to the New Mexico Herbal Center in March 1996.  One

of the notes indicates that Coyle wanted to reduce or eliminate the synthetic thyroid treatment she

had been taking but was scared about terminating the medication.  She had decreased the Synthroid

dosage steadily since 1988.   [Tr. at 371.]  She felt very apprehensive and was strongly opposed to

prescription drugs, including anti-depressants, and to "allopathic doctors in general."  [Tr. at 371.]

She reported exercising three times per week and walks with her dog.  She recently graduated from

her Master's program as an Art Therapist and continued to work in an internship program with

chronic mentally ill people, "which she can't stand and is very frustrated with ...."  [Tr. at 372.]

The March 1996 record from the Herb Center also indicates that Coyle spent much time and

money researching and buying quality supplements and herbs that she feels are most helpful to treat

the numerous symptoms and complaints she had.  She was active in a womens' drumming group and

had done "soul retrieval" and "journey work" for several years.  She had been working with a psycho-

therapist who worked with shamanism and imagery and she had seen a homeopath, Mary Alice

Cooper, who gave her 2 dosages of cancerous breast extract from sheep as a preventative for cancer.

She was to return for an additional treatment but could not afford it.  [Tr. at 373.]

The health care provider was hesitant to give her any more treatments to take and actually

thought reducing her vitamins and supplements might be a good idea.  He would not advise her to

reduce the Synthroid then.  The therapy note from March 28, 1996 shows that Coyle was stealing again.  [Tr. at 497.]

Carl B. Adams, Clinical Psychologist, performed a consultative examination of Coyle on April 29, 1996.  [Tr. at 321.]  She appeared apprehensive, guarded, defensive and impatient.  She reported that she had a Master's Degree in art therapy.  She wondered why testing was necessary.  She asked if she should answer the questions honestly or in a "socially appropriate manner."  She claimed that she was unable to work then due to pain and depression.

Adams performed the WAIS-R testing, the results of which placed her in the average range of intellectual abilities.  Adams concluded that she presented with no cognitive disabilities, was highly educated and capable of managing her life.  [Tr. at 324.]

On June 5, 1996, she was having problems with diarrhea.  She was scheduled for a "flex sig/endoscopy" but did not keep her appointment.  She refused a physical exam on April 17, 1996.  [Tr. at 357.]  She was scheduled for a barium enema later in the month, but it is unclear if she followed through.

On July 19, 1996, Coyle was seen at the New Mexico Herb Center by David Schwindt, M.D., Clinical Director.  Her main complaints were the fibrous tumor on her arm, fever blister, hot flashes, depression, irritable bowel or colitis.  She was prescribed some herbal remedies.  [Tr. at 367.]

Therapist Richardson wrote a letter, dated July 23, 1996, stating that she had been seeing Coyle since June 13, 1994 and that Coyle originally was referred by DVR with strong suicidal ideation and difficulties in the work place.  [Tr. at 359.]  Coyle continued to express depression and anxiety and was currently having trouble with employment.  Richardson concluded that Coyle suffered from PTSD and Dissociative Disorder due to childhood neglect and abuse, "possibly sexual

-20-

abuse." Her accidents in 1988 and 1991 (fall and car accident) "possibly exacerbated these disorders and have contributed to her continued poor emotional and job functioning."  Her physical condition seemed to be deteriorating and she was experiencing increased bowel problems.  Richardson assigned a GAF of 65 for the current and past year.  Without long term psychological services and financial assistance, Richardson reported Coyle had a "poor prognosis." [Tr. at 360.]

On August 7, 1996, the second administrative hearing was conducted by ALJ Wren.  [Tr. at 411-434.]  Coyle remained unrepresented.  She was interested in showing Judge Wren her fibrous tumor for which she was undergoing acupuncture treatment. [Tr. at 415.]  The ALJ commented that it looked like she had a muscle right below her shoulder.  Coyle said that she had not been able to sleep on that side since 1988.

Coyle testified that she graduated from the Master's Program in December 1995.  [Tr. at 423.]  She was trying to work from 15 to 20 hours per week (at $10.39 per hour) as an art therapist but described it as really hard.  [Tr. at 418.]  She had a good relationship with her supervisor.  [Tr. at 427.]  She worked with adults with chronic mental illness, which she found very stressful, although she liked her patients for the most part.  [Tr. at 421.]  The job also involved doing a lot of computer work which was hard on her shoulders and back.  She further told Judge Wren that "basically, I was just applying for partial disability and not – at the time when I could not work for those two years, three years, whatever it was, that's the time that I was hoping to get some kind of help with that – but basically I'm not asking for a – a full-time, big disability.  Just a partial with my limitations to help me supplement until I can figure out what I'm going to do." [Tr. at 421.]  She estimated another year to get licensed in the state to practice art therapy which would  mean she was still a student.  [Tr. at 423.]

She stated that her pain was "one thing" that she had been living with for five or six years but her depression had altered her life. She had been on Prozac but was then taking herbal remedies for depression. [Tr. at 424.] She had felt suicidal on the Prozac but was not feeling suicidal at the time of the hearing, although she said it was still hard to get up and clean house, or even shower. [Tr. at 425.] She said she lived alone and/or had no children, although she has one grown son, with whom she apparently has little or no contact. [Tr. at 425.]

After testimony from the claimant, the ALJ called the vocational expert to testify. The ALJ noted difficulty in formulating a question to the VE based on Coyle's testimony. Judge Wren said that she had returned to work and had her Master's but that there's an intervening time between 1991 and when she started part-time work, where she might be entitled to benefits. [Tr. at 428.] He asked the VE to consider her medical records, her PTSD, mental "situation," and her testimony about difficulties with some people at work. The VE provided information as to several sedentary, semiskilled positions that she thought Coyle could perform. Coyle contended that she could not perform those types of positions. She further stated, that if she could just get back to her art and see people privately, she would be a happy person.

The ALJ's August 27, 1996 opinion was unfavorable. Judge Wren concluded that Coyle's mental impairments were not severe and that she could return to her past relevant work as a counselor. He also found "significant credibility issues," and more specifically that her work history and current activities were inconsistent with her testimony of a disabling mental illness. [Tr. at 16.] In reaching his decision, Judge Wren rejected Coyle's claim at step 4 and did not rely on the Vocational Expert's testimony.

In October 1996, Coyle bought a home in the mountains and was planning the move.  She had taken a job in Santa Fe.  She was feeling positive overall and was expecting "the settlement soon." [Tr. at 493.]

Coyle retained an attorney after Judge Wren's adverse decision, and she filed a Complaint in federal court in December 1997.  The Commissioner agreed to remand for a third hearing, to update the medical record, obtain a further consultative mental exam, further evaluate Coyle's RFC and consider her diagnosis of fibromyalgia.  [Tr. at 488.]

On August 6, 1998, Coyle went for a routine follow-up medical appointment with Dr. Christopher McGrew.  He noted that she took .15 mg of Synthroid but that she took it in 3 separate .05 mg pills because she did not like dyes in medicines.  [Tr. at 521.]  She complained of the lipoma on her arm that was still growing and causing pain and nerve type symptoms.  She was referred to Dr. Wagner in Plastic Surgery for its removal.  She apparently did follow up and had it removed.

On September 24, 1998, Coyle was again involved in an auto accident and visited St. Joseph's emergency care unit.  She complained of neck pain and a sore chest.  Tests were ordered.  [Tr. at 533, 536.]  The results were unremarkable.  [Tr. at 536-37.]

In October and November 1998, Coyle was seen at the New Mexico School of Natural Therapeutics regarding her neck and back pain, related to her auto accidents, etc.  [Tr. at 539-41.]

For several months in 1999, Coyle was seen at Carlisle Health and Rehabilitation for electric stimulation therapy, traction and message therapy.  Several of these records refer to a motor vehicle accident and resulting injury on April 5, 1999, although the date may be incorrect.  [Tr. at 547, 550.] Coyle complained of left side pain and low back pain generally and received various physical therapies.

On October 17, 1999, Richard P. Reed, Ph.D, performed a consultative exam on Coyle at the request of New Mexico DDS.  [Tr. at 556.]  Coyle arrived 25 minutes late.  Reed administered the WAIS-III test.  She reported that she had a bachelors degree and two masters degrees.  She said she could not work full-time since 1985.  She reported an eating disorder, a thyroid disorder, fibromyalgia, an anxiety disorder, a dissociative disorder from childhood, PTSD, obsessive compulsive disorder, bipolar disorder, and clinical depression.  She stated that she worked, received unemployment and sold her things to pay to survive.

She told Reed that she felt suicidal that day but was not going to do it.  He observed her mood as mildly depressed, with no evidence of an anxiety disorder.  [Tr. at 557.]  Reed also said there was a dramatic quality to her presentation that day.  She mentioned at one point that she had spoken to her deceased mother that day, although she said she knew that sounded "bizarre."  Her attention and concentration were good throughout the administration of testing.  Reed did not have all of the medical records to review, but based on his evaluation, he concluded that she suffered from elements of several personality disorders, e.g., histrionic, borderline and narcissistic.  [Tr. at 558.]

On January 18, 2000, Martone, Coyle's attorney then, wrote to the ALJ who was to handle the third hearing and stated that her applications were for closed periods from Nov. 27, 1991 through April 1995, and Jan. 1997 through Sept. 1998.  The job with ROC (Rehabilitation, Health and Occupational Center) that Coyle held for about one year and a half, although part-time, still qualified as substantial gainful activity.  [Tr. at 593.]  She worked as an APS teacher from October 1998 through May 1999 and then received unemployment for 3 months in 1999.  In October 1999, she returned to teach at APS.  [Tr. at 566.]

-24-

The last hearing was held before ALJ Johnson on January 20, 2000.  [Tr. at 569.]  She was teaching English Journalism and was the school newspaper advisor at Valley High School then and believed that she could continue to do so.  [Tr. at 573, 575.]

Judge Johnson asked how the fibromyalgia affected her.  She said "it was an injury of my left side, my left foot, ankle, knee, hip, I fractured my shoulder and that was the first accident I had, then I was rear-ended and fractured my back in two places and neck injury.  What that means now, is basically I have a chronic thing with, with the left side tingling and numbness in my arm and hand." [Tr. at 576.]  It also created a sleep disorder.  However, she had learned to live with choric pain.  She mentioned TMJ too.  [Tr. at 577.]

The ALJ asked her to describe her depression.  She said it was when she did not want to get out of bed and could not get out of bed.  "I was counseling and I also had a small business, and I just couldn't do that.  It was, kind of a public relations and graphic arts business . . . ."  [Tr. at 578.]  She said she was in this type of depressed state from 1988 to 1990, which was when she was introduced to Prozac.  That helped her initially.  After the whiplash in November 1991, however, she began to have more than just depression.

She thought of all the doctors who saw her in New Mexico, Dr. Arnett helped the most.  [Tr. at 580-81.]  She also thought that therapist Richardson saved her life.  [Tr. at 581.]  Moving to live in the mountains also saved her life.  [Tr. at 582.]  She was able to buy a small place in the mountains because when her grandfather died in 1995, he left her "some money."  [Tr. at 582.]

She said she was a clay sculptor but did acrylic paintings.  She had some problems dealing with people generally perhaps because of her low motivation and tolerance or even her attitude.  "I

-25-

mean I'm pretty, I'm from the East and we kind of speak out, I've had people . . . feel that ti's

aggressive or maybe abrasive sometimes, but it's . . . a directness." [Tr. at 584.]

She also reported that there were times when she could not take care of her personal needs,

although being OCD (obsessive/compulsive disorder) now, "everything is organized . . . ."  With

respect to how she was able to deal with her chronic pain, she said she just learned to live with it,

along with herbal supplements and physical therapies.

Judge Johnson issued his opinion on April 24, 2000. [Tr. at 444.]  He denied the disability

request at step 5, relying on the grids.  He had a VE available, but decided vocational testimony was

unnecessary.

### Discussion

In this appeal, Coyle asserts that she is entitled to an immediate award of benefits or that the

case should be remanded because the grids were improperly applied in view of Coyle's nonexertional

impairments, which include her mental impairments and pain. The Commissioner claims that the

ALJ's decision was supported by substantial evidence and represented a correct application of the

regulations.

This case is difficult to analyze for a number of reasons, not the least of which are the period

of ten years that it spans and the significant medical record.  In addition, Coyle's many treating

physicians and therapists did not discuss her ability to work, and yet they repeatedly diagnosed her

with depression or dysthymia and borderline personality disorder, and documented her ongoing

suicidal ideation.  Indeed, the records of the various health care professionals are replete with various

wide ranging diagnoses.  Coyle's records include findings of fibromyalgia, hyperthyroidism, hypo-

glycemia, fibrous tumors, spinal facet degeneration, colitis, polyspinal stenosis, major depression,

personality disorders, post traumatic stress syndrome, obsessive compulsive disorder, alcohol and poly drug abuse and dependence, anxiety disorder, eating disorder, dissociative disorder, learned helplessness syndrome, possible bi-polar disorder, affective disorder, dysthymic disorder, and chronic suicidal ideation.  In addition, there are patient complaints of pain, insomnia, fatigue, hopelessness and anger.

This case is also challenging because three different Administrative Law Judges clearly found that Coyle was not entirely credible.  Moreover, the record supports some disbelief as to Coyle's assertions.  Her honesty, for example, is in question based on her shoplifting behavior and her ability to succeed in academic endeavors at the same time she fails in nearly all other endeavors.  She was overly dramatic at times -- wore sunglasses through medical appointments and hearings, apparently without always explaining why.  She was manipulative and unreasonably demanding at times – admitted that she used emotional blackmail with a therapist when she threatened suicide; threatened to walk out of the hospital after waiting one hour for treatment; and threatened to quit therapy when the therapist did not attend her graduation or hug her.  She seemed to try to find ways to support herself without working or through minimal work, i.e., through  student loans, unemployment, proceeds from lawsuits, work-study projects, and social security benefits.  Moreover, her assertions that she was unable to work due to depression and/or pain are, at least, somewhat inconsistent with her ability to obtain a Master's Degree in art therapy at UNM, while working part-time as well.

However, notwithstanding these and other troubling aspects of the record, the Court cannot find substantial evidence to support the ALJ's decision that Coyle's mental impairments were not "severe" at step two of the sequential evaluation process, which requires only a *de minimis* showing of medical severity.  Further, under the circumstances here, where Coyle already has had three

administrative hearings and the record is fully developed, the Court concludes that remand for yet another hearing would be inappropriate.  Thus, after a meticulous examination of the entire record, this Court recommends, for the reasons set out below, that Coyle receive an immediate award of benefits for the closed periods of which her attorney set forth in his letter, dated January 18, 2000: November 27, 1991 - April 1995; and January 1997 – September 1998.[17]  [Tr. at 565.]

## I.   STEP TWO: SEVERE IMPAIRMENTS

At step two, the Tenth Circuit requires only a "de minimis" showing by the applicant that she had an impairment that would have more than a minimal effect on her ability to do basic work activities.  Hinkle v. Apfel, 132 F.3d 1349, 1352 (10th Cir. 1997).  Only claimants with slight abnormalities that do not significantly limit any "basic work activity" can be denied benefits without proceeding with a vocational analysis.  Bowen v. Yuckert, 482 U.S. 137, 157, 107 S.Ct. 2287 (1987). "A severe impairment is one that interferes with basic work activities."  Roberts v. Callahan, 971 F. Supp. 498, 500 (D.N.M. 1997).  Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs," including walking, standing, sitting, lifting, hearing, seeing, speaking, understanding, carrying out simple instructions, use of judgment, responding appropriately to supervision and co-workers, and dealing with changes in a routine work setting.  20 C.F.R. § 404.1521(b)(1-6).

Although step two requires only "de minimis" proof of impairment, the applicant "must show more than the mere presence of a condition or ailment."  Hinkle, 132 F.3d at 1352.  An impairment

---

[17]The ALJ elected to consider the entire period under review for purposes of awarding or denying benefits, notwithstanding Martone's letter setting forth closed periods of disability.  The Court considers Coyle's attorney's letter [Tr. at 565] to be an admission that Coyle was able to or did engage in substantial gainful activity during those periods for which he did not request benefits on behalf of Coyle.

is not severe "if it does not significantly limit your physical or mental ability to do basic work

activities." 20 C.F.R. § 404.1521(a).  Likewise, an impairment is not severe if it is only a slight

abnormality with a minimal effect on the ability to work.  Roberts, 971 F. Supp. at 500 (*citing* SSR

85-28).

> Presumptively, if the medical severity of a claimant's impairments is so slight that the
> impairments could not interfere with or have a serious impact on the claimant's ability
> to do basic work activities, irrespective of vocational factors, the impairments do not
> prevent the claimant from engaging in a substantial gainful activity. If the claimant is
> unable to show that his impairments would have more than a minimal effect on his
> ability to do basic work activities, he is not eligible for disability benefits.  If, on the
> other hand, the claimant presents medical evidence and makes the *de minimis* showing
> of medical severity, the decision maker proceeds to step three.

Williams v. Bowen, 844 F.2d 748, 751 (10th Cir. 1988) (*citing* Bowen, 482 U.S. at 140).

ALJ Johnson found, at step two, that Coyle did not have any "real psychological limitations"

during the time under review.  Judge Johnson's step two determination was based on a recent Richard

Reed's psychological evaluation, Coyle's more recent therapy records, and Judge Wren's prior

decision that discussed Coyle's earlier records.  [Tr. at 446-47.]  Because Judge Johnson concluded

that there were no nonexertional limitations, he subsequently applied the grids at step 5 to determine

a finding of non-disability.  Judge Johnson's conclusions, however, fail to give any credit to the very

substantial medical records detailing Coyle's emotional and psychological history.

This Court finds a lack of substantial evidence to support the ALJ's step two finding as to

Coyle's depression.  During the closed periods under review, Coyle's medical records are replete with

references to her depression and suicidal ideation.  For example, on January 13, 1992, Dr. Dawes

diagnosed her with major depression, although she was well managed on Prozac then.  She had

underlying dysthymia.  [Tr. at 235.]  On February 6, 1992, Dr. Williams noted depression.  [Tr. at

152, 153.]  On February 17, Dr. Dawes indicated that she may have become tolerant to Prozac.  On May 18, 1992, Dr. Dawes referred her to Dr. Williams because of dysthymia.  He thought Coyle should continue on an anti-depressant indefinitely.  [Tr. at 134.]  On July 14, 1992, Dr. Williams noted a diagnosis of depression.  [Tr. at 129.]  Dr. Williams recommended that Coyle see a counselor related to her depression, and Coyle was taking anti-depressant medication, although she was concerned with side effects.  [Id.]  She stated that she felt good for awhile on Prozac but periodically became more depressed.  She wanted to sleep all the time.  She told Dr. Williams sometimes she felt she would be better off dead, although she had no plans.  [Tr. at 131.]  On August 13, 1992, a physician noted his impressions of fibromyalgia and depression.  [Tr. at 127.]

From May 15, 1992 through June 1993, Coyle discussed her depression and/or "chronic, intermittent" suicidal ideation almost weekly with Dr. Allen.  [Tr. at 167-216.]  *See also* Richardson therapy records from June 1994 - June 1996.  [Tr. at 359.]  She frequently spoke of feeling "very down, very depressed."  [Tr. at 170.]  She had several "contracts" with therapists that set forth her promise not to hurt herself.  [Tr. at 171.]  Dr. Allen noted dysthymia and/or borderline personality disorder on some of Coyle's records.  [Tr. at 190, 197, 203.]  During this same period, Coyle also saw Dr. Parks for anti-depressant medication.  [Tr. at 173.]

Dr. Allen obtained Coyle's previous psychological records from Maryland where Coyle apparently saw 17 different therapists.  [Tr. at 204.]  A psychiatrist from Maryland diagnosed Coyle with major depression, Type II bipolar disorder, personality disorder and recommended "ongoing intensive psycho-dynamic therapy."  [Tr. at 204.]

On August 22, 1994, Dr. Arnett noted diagnoses of major depression recurrent, PTSD, OCD, eating disorder, and history of poly-substance dependence in remission.  [Tr. at 308.]

-30-

The consultative exams of Coyle also document mental impairments.  On March 23, 1993, Dr. Balcazar's diagnosis was dysthymic disorder, atypical personality disorder.  [Tr. at 222.]  Her optimal functioning during the prior year was poor.  Nonetheless, he believed she could use tools and materials for simple jobs.  On June 14, 1994, Dr. Roy stated that Coyle suffered with long-standing psychiatric disability.  [Tr. at 302.]  While she was not taking anti-depressants then, she informed Roy that she had difficulties with side effects.  [Tr. at 303.]  His impression was major depression and possible bipolar affective disorder.  "[I]t seems that with her chronic dysthymia, mixed with depression and possible personality dysfunction, she has never gainfully used her therapeutic measures in the past."  [Tr. at 305.]

On April 29, 1996, Carl Adams, Ph.D. performed a psychiatric evaluation.  His report is not particularly helpful as he primarily reports what she told him.  He did, however, find her evasive and defensive.  He administered an intelligence test and noted that she reported a long history of depressive disorder, OCD and dissociative disorder.  He provides no comment on whether he believed these diagnoses.  [Tr. at 324.]

On October 17, 1999, Richard Reed, Ph.D. concluded that Coyle suffered from elements of several personality disorders, e.g., histrionic, borderline and narcissistic.  [Tr. at 558.]  Reed found that Coyle had a marked impairments in the ability to work in coordination with others and in the ability to accept instructions and to respond appropriately to supervisors' criticism.  He also found a number of moderate limitations with respect to Coyle's abilities to understand, remember, carry out detailed instructions, to make simple work-related decisions, to interact appropriately with the general public, to get along with coworkers or peers, and others.  [Tr. at 559-60.]

Coyle's own assertions about her depression, during the pertinent time periods, also support a finding of severity at step two.[18]  For example, in November 1992, she stated that her depression made it impossible to be motivated.  She was isolated, had little social interaction, and claimed she had suicidal thoughts.  [Tr. at 83, 86.] She was not able to drive nor get out of bed some mornings.  [Tr. at 77-78.]  She was "very low functioning due to depression . . . ."  She and her doctor spoke about inpatient hospitalization on several occasions.  [Tr. at 92.]  And while perhaps not relevant to this inquiry, Coyle was hospitalized for a prior suicide attempt years prior to her disability application.

In 1994, she stated that depression, hopelessness an limited activity with chronic pain were constant companions during that time.  [Tr. at 288.]  She felt she had lost several positions because of her depression and hopelessness.  [Tr. at 289.]  In addition, her job history is intermittent and sparse.  She does not seem to be able to retain jobs for long periods of time and has difficulty communicating or getting along with co-workers.  [Tr. at 288-91, 297-301, 380.]

The Commissioner argues that Coyle did well when she was properly maintained on psychotropic medications, and that any impairments were reasonably controlled by such treatments.  In addition, the fact that Coyle was able to work during some of this time period and obtain a graduate degree might support the Commissioner's position.  Notwithstanding these intervals when Coyle apparently did fairly well.  It strains credulity to accept a conclusion that Coyle did not have any real psychological limitations.  The record demonstrates that Coyle tried a number of different anti-depressant medications and that she suffered from side effects she could not tolerate or that certain medications lost their efficacy over time.  She complained that she even felt suicidal while

---

[18]While medical evidence alone is evaluated at step 2, Roberts, 971 F. Supp. at 500, the Court briefly summarizes some of Coyle's assertions, along with the medical evidence already discussed.

taking one of the anti-depressants.  Her employment history indicates that she has held a number of positions, some for short periods of times.

The fact that an individual does not suffer from severe symptoms at times and that medications periodically ameliorate the symptoms does not automatically mean the impairment is non-severe.  "Given the unpredictable course of mental illness, '[s]ymptom-free intervals and brief remissions are generally of uncertain duration and marked by the impending possibility of relapse.'" Black v. Barnhart, 237 F. Supp. 2d 1099, 1107, 1108 (S.D. Iowa 2002) (internal citation omitted); see Roberts, 971 F. Supp. at 501 (mentally ill claimants can have symptom free intervals, and their ability to work at times does not mean the impairment is not severe).

In sum, the objective medical evidence, along with the evaluations of Coyle's therapists, simply does not support a finding of non-severity under the step two "de minimis" standard.  While a manipulative malingerer could well fool some of these professionals, it is so highly unlikely that virtually all of them could have been deceived.  The records demonstrate mental impairments amounting to more than a "slight abnormality."[19]  Thus, there were nonexertional impairments that should have been considered during the remaining portions of the sequential evaluation.[20]

---

[19]Even if Coyle is fabricating her symptoms of depression for purposes of being awarded disability benefits, her extreme effort to do so is additional evidence of the personality disorders of which she is diagnosed.

[20]Coyle also argues that ALJ Johnson's finding of non-severity at step 2 was erroneous because of the "law of the case" established by the first ALJ's decision that Coyle's impairments were severe at step 2.  It appears that the Tenth Circuit has not applied the law of the case doctrine in social security disability benefits cases.  Williams .v Apfel, 65 F.Supp.2d 1223, 1229 (D. Okla. 1999.)  Even if the doctrine did apply, the Court is not convinced that the law of the case supports Coyle's position.  Here, Coyle's case was remanded several times with directions to review additional evidence as to Coyle's depression and to order another psychological consultation.  The new evidence could have directed a different result at several of the different sequential steps.  Thus, it would seem that the sequential steps would have to be evaluated anew in light of the new evidence.  Indeed, previous determinations are not applied if there are reasons rendering the law of the case doctrine inapplicable, like substantial new evidence being introduced after the first review.  Chicago & North Western Transp. Co. v. U.S., 574 F.2d 926, 930 (7th Cir. 1978).

**II.**       **APPLICATION OF GRIDS WITHOUT THE USE OF VOCATIONAL TESTIMONY**

The grids consider only exertional or strength impairments.  Hargis v. Sullivan, 945 F.2d 1482, 1490 (10th Cir. 1991).  Exclusive resort to the grids is inappropriate when evaluating nonexertional limitations, such as a severe mental impairment.  Grimiar v. Sullivan, 966 F.2d 1326, 1333 (10th Cir. 1992).  Under circumstances where there are nonexertional limitations, a vocational expert must be consulted to determine whether a significant number of jobs is available in the national/regional economies that the claimant can perform despite the impairments.  Cruse v. U.S. Dept. of HHS, 49 F.3d 614, 619 (10th Cir. 1995).   For example, if it is determined that a claimant has a severe mental impairment, it may follow that she cannot perform a full range of work in the sedentary category.  Tafoya v. Barnhart, CIV No. 01-489 BB/DJS (D.N.M. April 30, 2002) [Doc. 12].

On the other hand, the ALJ may apply the grids without relying on a vocational expert if the ALJ determines the claimant has no significant nonexertional impairments affecting her RFC.  Evans v. Chater, 55 F.3d 530, 532 (10th Cir. 1995); Thompson, 987 F.2d at 1488.  Here, as discussed above, the ALJ should have found that Coyle had severe nonexertional impairments, at least with respect to her depression, and should have analyzed their effect on her ability to perform work.  Judge Johnson determined that Coyle had exertional limitations.  Once a claimant's RFC is diminished both by exertional and nonexertional impairments, the Secretary "must produce vocational testimony or other similar evidence to establish the existence of jobs in the national economy," that she can perform.  Hargis, 945 F.2d at 1491.  Thus, exclusive reliance on the grids was error.

**III.      REMAND FOR RE-HEARING OR IMMEDIATE AWARD OF BENEFITS**

The Court may choose to remand for further hearing or to remand for an immediate award of disability benefits. Ragland v. Shalala, 992 F.2d 1056, 1060 (10th Cir. 1993). "Outright reversal and remand for an immediate award of benefits is appropriate when additional fact finding would serve no useful purpose." Sorenson v. Bowen, 888 F.2d 706, 713 (10th Cir. 1989); Harris v. Sec'y of HHS, 821 F. 2d 541, 545 (10th Cir. 1987). *See also* Nielson v. Sullivan, 992 F.2d 1118, 1122 (10th Cir. 1993) (directing immediate award of benefits due to Commissioner's failure to follow regulations, claimant's advanced age, medical record supporting finding of disability and length of time case was pending) Halliday v. Apfel, 2000 WL 33201280 at *2 (D. Oreg. Sept. 28, 2000) (remanding for calculation of benefits where there were three administrative hearings, multiple appeals, and a voluminous record); Black v. Barnhart, 237 F. Supp. 2d 1099 (S.D. Iowa 2002) (remanding for award where it was clear that the applicant's chronic mental illness demonstrated she was unable to work on a consistent basis).

Here, the Court sees no useful purpose in remanding for a fourth hearing so that the Court may re-examine its Listing analysis at step four or call a vocational expert for further testimony. Judge Wren did pose questions to a vocational expert at the second hearing, but seemed hard-pressed to think of appropriate questions based on the difficult circumstances this case presents. In addition, the case has been pending over ten years and has been reviewed by three different ALJs. Additional consultative exams have already been ordered and performed. Thus, the Court recommends remanding for an award of benefits for the closed periods set forth by Coyle's counsel.

## **Recommended Disposition**

That Coyle's motion to reverse and remand [doc. 9] be GRANTED and that this matter be remanded for a calculation of benefits to be awarded to Coyle in accordance with this opinion.


_____
Lorenzo F. Garcia
United States Magistrate Judge